The People of Puerto Rico, Plaintiff and Appellee, *v.* Juan Rivera Beltrán, Defendant and Appellant.

Nos. 11526 and 11527. Argued December 2, 1946.—Decided April 17, 1947.

*Benjamín Ortiz* and *Alonso Ortiz* for appellant. *Luis Negrón Fernández, Acting Attorney General (E. Campos del Toro,* former *Attorney General,* on the brief), and *J. Correa Suárez, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Appellant was convicted of two crimes of murder, committed on Máximo and Juan Velázquez. Since both offenses were part of the same transaction and the evidence was, naturally, the same in both cases, the latter were consolidated for the purpose of the trial. They have been likewise consolidated for the purpose of this appeal. The jury found him guilty: in the case of Máximo Velázquez of murder in the second degree, and in that of Juan Velázquez of voluntary manslaughter, being sentenced to terms of twelve and five years, respectively, in the penitentiary. He appealed from both judgments and assigns four errors. In the first three errors he urges that the verdict is contrary to the evidence, and in the fourth that the trial court erred in failing to admit the testimony of his sister with which it was sought to prove that the Velázquez brothers had a motive for assaulting the defendant and thus establish that Máximo and not the defendant was the first one who attacked.

We shall presently discuss whether the verdicts are supported by the evidence. The witnesses for the prosecution who testified as to the commission of the crimes were Nicanor Burgos Vélez, Juan Rodríguez Soto, José Vega Delgado, and Luis Velázquez Vélez.

*Nicanor Burgos Vélez* testified that he was a relative of the decedents; that he was near the place of the occurrence and heard someone cry: "He has killed him"; that he rushed to the place and saw defendant struggling with Juan Veláz-

quez while Máximo Velázquez was lying on the floor moaning; that the Sánchez came and took the wounded away and then defendant left; that when the defendant went away, Juan Velázquez was still on the floor wounded; that the defendant had a knife in his hand about eight inches long and that he did not notice that Juan Velázquez had any weapon.

*Juan Rodríguez Soto* testified that at 8:00 p. m. on the day of the occurrence, he was in defendant's store near the main highway in the ward of Aguacate, Yabucoa; that Máximo and Juan Velázquez arrived at the store with a bottle of rum in their hands; that when they came in, Máximo Velázquez pushed the witness against the wall; that then Máximo went to the back yard and said to the witness: "We are drinking rum and we will fight if we have to" and then went to a corner of the store and told him that he meant no quarrel with the witness; that he (Máximo) wanted the defendant to interfere so that he could then attack him; that when Máximo returned to the store the three of them began to fight, that is, the Velázquez brothers and defendant; that he saw when the defendant wounded Máximo with the knife that he kept in the store; that when the three of them were fighting, Luis Velázquez arrived and struck defendant with a stick; that when Luis Velázquez assaulted defendant, Máximo was already wounded; that Máximo was the first one to pull out a knife; that he saw Máximo wounded but no one else; that Juan Velázquez threw a stick at the defendant but missed him and struck the light, putting it out; that before defendant wounded Juan Velázquez, the latter had assaulted him with the stick.

*José Vega Delgado* testified that he is a relative of the defendant but not of Máximo or Juan Velázquez; that while the witness was in defendant's store, Máximo and Juan Velázquez arrived in gay spirits, greeted, and entered the store, Máximo carrying a bottle of rum; that Máximo said: "Gentlemen, I bring this here because we are all going to have a drink," but the persons who were in the store did not

accept except Juan Rodríguez Soto, who drank with both brothers; that Máximo laid down the bottle and said "We drink and if we have to fight, we fight"; that then he placed his hand on Juan Rodríguez Soto's chest, and struck him with the fist; that the defendant intervened and said "What is the matter, Máximo? Please stop that"; that then Máximo said "We have stopped"; that nothing else happened; that about a minute later Juan Velázquez asked Máximo to leave, but Máximo refused and the witness went home; that he did not see the defendant or the Velázquez brothers holding any weapon; that the defendant was sober; that Máximo and Juan Velázquez were in gay spirits, because they had been drinking.

*Luis Velázquez,* the last witness for the prosecution, testified that on the day of the occurrence he met his brothers Máximo and Juan in defendant's store where the witness went to buy some cigars; that it was getting dark and the witness asked his brothers to leave; that the defendant came down from the store with a knife and started to stab his two brothers; that he first stabbed one and then the other and the witness shouted, whereupon the defendant stabbed him on the left side of his face, (he showed the scar to the jury); that upon being wounded the witness left; that Juan received six stabs, four while he was standing and the others after he had fallen down; that while he was stabbling Juan, Máximo was lying on the floor wounded; that neither Máximo nor Juan had any weapon; that his brothers had assaulted no one.

The evidence for the defense consisted in the testimony of *Miguel Montezuma* and of defendant. Montezuma confined himself to testifying that on the afternoon of the day of the occurrence he met Máximo and Juan Velázquez; that they reached the store of El Bobo, in the ward of Aguacate, Yabucoa, at 3:30 P.M.; and they invited him to have a drink and he accepted; that they invited him to go to defendant's store and he asked them why were they going there and they

answered: "We are going there because today either we kill Juan Rivera or Juan Rivera (the defendant) kills us"; that the witness told them that he could not go with them because Juan Rivera was a good man, of good behavior, and a friend of his; that the witness told him that he was going home but instead, he went directly to Juan Rivera's store and told him "Listen, Máximo and Juan are coming here to kill you" and then defendant answered: "Why? I am not quarrelsome, I have done nothing except that Juan is in love with my sister, but I have had nothing to do with that, so do not worry," and the witness left.

The defendant testified that on August 31, 1942, at 8 p.m., the Velázquez brothers came again to the store; that upon entering, Máximo said: "What is the matter?", and the witness answered: "Nothing"; and then Máximo said: "Well, if nothing is the matter, come down, we have come to fight"; that the defendant stopped and Máximo came up and struck him with the fist; then Máximo took out a knife and tried to stab him; that it was a kitchen knife, five or six inches long; that Máximo made a stab at the defendant but he escaped it; that the knife which he used for cutting bacon and codfish was on top of the counter and he was forced to use it to defend himself with the knife, wounding Máximo; that at the same time Juan Velázquez was coming up and assaulted him with a stick of *"higuillo"*; that when he struck at him with the stick defendant bent down and the stick hit the light, putting it out and the fight hand to hand started.

On cross-examination, he testified that Máximo was taller, stouter and stronger than he; that when the lights went out the defendant began to strike ,at random; that he does not know how many wounds he inflicted on Juan Velázquez;[1]

---

[1] The certificate of autopsy admitted in evidence revealed that the body of Juan Velázquez presented the following wounds:

"1. An incised wound 2½ cms. long in anterior aspect of right shoulder with oblique penetration of 5 cms. in the right axillary region without damaging any important structure.

"2. Similar wound in the left lateral region of the thorax between the seventh and eighth rib without penetrating into the pleural cavity.

that the witness knew that he was striking, but with the lights out he did not know whether the knife stuck in the shaft or in something else; that the defendant was not wounded. Upon being examined by the defense he mentioned Montezuma's statement with reference to the intention of the Velázquez brothers to kill him.

This was in brief the evidence brought before the jury. Indeed, the testimony of some of the witnesses for the prosecution tended to prove that it was Máximo Velázquez who first started the fight and who used the weapons before the defendant did. However, that of witness Luis Velázquez tended to prove that his brothers, the decedents, had no weapons; that it was the defendant who first attacked them. The jury were not bound to bring in a verdict of acquittal because the testimony of the government's witnesses might be conflicting. Their function was to ascertain the truth and give credence to the witness, who, in their opinion, deserved it irrespective of the number of witnesses to the contrary. It seems pertinent to quote from Mr. Justice Mc Leary in *People* v. *Español,* 16 P.R.R. 203, 220:

"It is claimed by the appellant that the verdict of the jury is contrary to the evidence, and a great effort has been made to show this by comparing the testimony of the several different witnesses, one with another, and pointing out alleged contradiction in the various

"3. Similar wound in the medial region of the back at the level of the seventh dorsal vertebra, 2½ cms. deep without penetrating into the pleural cavity nor damaging any important structure.

"4. Similar wound in the left side of the back, one-half inch from the midline and at the level of the eighth intercostal space penetrating 2 cms. without damaging any important structure.

"5. Incised wound of similar appearance to the above-mentioned ones but 4 cms. long, in the right side of the back two inches from the mid-line and at the level of the 11th intercostal space and which penetrated into the right pleural cavity, perforating the diaphragm in its posterior portion, and penetrated the right kidney in the posterior aspect of its superior pole crossing the parenchyma of this organ, the wound ending under the parietal peritoneum which covers the anterior aspect of the kidney.

"6. Incised wound 2 cms. long one-half inch away from the wound previously described, 2 cms. deep and which did not perforate the posterior abdominal wall."

parts of the testimony of particular witnesses, and especially, in that of the prosecutrix and her brother. There is, no doubt, considerable conflict in the testimony of the different witnesses, as compared with each other, and some inconsistencies in the several statements made by some of the witnesses for the prosecution. This occurs in nearly all closely contested criminal trials. But it is the province and the duty of the jury, under proper instructions from the court, to weigh the evidence and reconcile, so far as possible, the inconsistencies or the contradictions in the testimony, and to sift the grain of truth from the mass of chaff, which may be found therein, and thus arrive at a just verdict founded on the facts proven. So far as we can see, from a careful perusal of the record and the briefs, this duty has been fairly performed by the jury; and we do not feel justified in saying that any error has been committed in this particular. Another jury on the same facts, under proper instructions, might arrive at an entirely different verdict, which we might feel the same hesitation to disturb.

"There is nothing in this record to show that the jury, which tried this case in the court below, was moved, or in any way influenced, by passion, prejudice or partiality; and in such cases we have frequently held that this court will not modify the finding of a trial judge, or set aside the verdict of a jury."

The jury believed the testimony of Luis Velázquez but not that of the other witnesses for the prosecution in so far as it tended to establish that the defendant had killed Máximo and Juan Velázquez in self-defense. Upon examining the testimony of the defendant, it is worthy of note that when he described the arrival of the decedents at the store and explained how the fight began, his explanation differs from that given by the witnesses for the prosecution, whose testimony favored the defendant. According to the latter, the decedents arrived at his store for the second time at eight o'clock on the night of August 31, 1942, and what happened was as follows: When Máximo arrived, he asked the defendant "what is the matter?" and when the defendant answered nothing, Máximo replied: "Well, if nothing is the matter come down, we have come to fight," but when the defendant stopped, Máximo came up and struck him with the fist and imme-

diately thereafter pulled out a knife and assaulted the defendant without wounding him, whereupon the defendant then took a knife that lay on top of the counter and inflicted the fatal wound.

The jury probably considered this testimony in connection with that of José Vega Delgado and Juan Rodríguez Soto, who—the latter especially—told the story of the arrival of the Velázquez brothers at the store and of the manner in which the fight began, completely different from what defendant testified. In considering this testimony for the prosecution in connection with defendant's and with that of Luis Velázquez, witness for the prosecution, the jury might have easily concluded that the witnesses for the prosecution, whose testimony favored the defendant, deserved no credit. Since the verdict is supported by the testimony of Luis Velázquez, whom the jury had a right to believe,[2] we should not disturb it, especially if we take into account that the jury saw and heard the witnesses testify and by their conduct in the witness stand, is in a better position than this Court is to determine who spoke the truth.

 We concede that the verdict of voluntary manslaughter, in relation to the death of Juan Velázquez is erroneous and that it should be murder in the second degree. In our opinion it is erroneous because assuming that Juan Velázquez assaulted the defendant with a stick,[3] they all agree in that the stick broke without injuring the defendant. The fact that defendant assaulted him as he did, inflicting six stab wounds on a man who was carrying no weapon, showed that he had a perverse and wicked heart. The crime committed

---

[2] Juan Rodríguez Soto, a witness for the prosecution, erroneously stated at the beginning of his testimony that Luis Velázquez assaulted the defendant with a stick, but later the former corrected himself by saying that it was Juan Velázquez who did it. The part taken by Luis Velázquez, according to his testimony, was his shouting when he saw that he was killing his brothers and then that defendant assaulted him with a knife cutting his face.

[3] The evidence shows that when Juan Velázquez assaulted the defendant with a stick, his brother Máximo had already been stabbed and was completely overpowered.

under these circumstances is murder in the second degree but since this error far from prejudicing the defendant favored him, it is not reversible error.

▮ We shall presently discuss whether the court erred in failing to admit the testimony of Carmen Rivera, defendant's sister. This testimony was offered for the purpose of proving hostility against the defendant on the part of Máximo Velázquez and the possibility that it was the latter who started the combat.

The defense announced that the testimony that this witness would have given was substantially as follows: That about four years ago, Máximo Velázquez made love to her but she rejected him; that at that time he entered her house and that she had to bring a complaint against him for breach of peace.

The judge sustained the district attorney's objection on the ground that the evidence was remote. Then the defense announced that it also intended to prove with the witness that on the day preceding the events, Máximo Velázquez again went to her house and asked her whether she was married or single.

It does not seem doubtful that the first part of the proposed testimony, that is, what happened four years ago, is remote. But in any event the question whether the offered evidence is remote, is one that rests in the sound discretion of the trial court. 2 Wigmore, *Evidence* (3rd ed., 1940), § 396.

▮ As to the last visit of the defendant on the day preceding the occurrence, apart from the fact that it seems incredible,[4] its purpose was so idle that the admission of said evidence could not have influenced the jury at all.

---

[4] It seems incredible that although Carmen Rivera and Máximo Velázquez had been living in the same place at least for more than four years with the opportunity of seeing each other often and with the interest that it was sought to prove he had in her, it was necessary for Máximo to go and ask her what probably all the neighbors knew, that is, whether she was single or married.

For the reasons stated the judgments appealed from should be affirmed.

Dissenting opinion of Mr. Justice Todd, Jr., in which Mr. Chief Justice Travieso concurs.

In my opinion the evidence for the prosecution, including the testimony of Luis Velázquez, showed that defendant acted upon a sudden quarrel provoked by the brothers Máximo and Juan Velázquez, or in a heat of passion, also as a consequence of said provocation. Even if we should disregard, as the jury did, the theory that the defendant acted in self defense, the evidence for the prosecution (except Luis Velázquez) as well as that for the defense, show that the defendant was in his store and that it was Máximo and Juan Velázquez who in a drunken condition, provoked and assaulted him. It is worthy of note, also, that Luis Velázquez came to the store after his brothers and that he then insisted in taking them away but they refused to go. This fact is significant, for if Máximo and Juan were behaving themselves, why should their brother Luis want to take them away?

In my opinion the case at bar is not similar to *People* v. *Español*, 16 P.R.R. 203, cited by the court, wherein there was a "conflict in the testimony of the different witnesses, as compared with each other, and *some* inconsistencies in the several statements made by some of the witnesses for the prosecution." Here we are confronted with the fact that all the witnesses for the prosecution, with the exception of one, Luis Velázquez, a brother of the decedents, who also took part in the affray and was wounded,[1] corroborate defendant's theory and evidence that he acted upon a sudden quarrel or in a heat of passion. The testimony of Luis Velázquez, besides being prejudiced, is incredible. It is incredible because since there was no proof that the defendant was insane or intoxicated, it is inexplicable that he should assault three

---

[1] It was proved that the defendant had been acquitted in the case of assault against witness Luis Velázquez.

persons with a knife without any provocation having taken place. And that is what the witness testified. Common sense and natural reason indicate that such is not the ordinary behavior in life. It is true that it is the province of the jury to settle the conflict in the evidence and as a general rule we accept its verdict based on the credibility of the witnesses, but this does not mean that if manifest error is committed in weighing the evidence, or if the evidence is of such a nature that it does not support the verdict, we may not disturb it.

The evidence was, in my opinion, sufficient to establish, beyond a reasonable doubt, that at most what occurred there was the result of a sudden quarrel or heat of passion (and the jury so understood it in one of the verdict) and, therefore, the verdict of murder in the second degree rendered in the other case is not supported by the evidence and it should be reversed.